NO. 24–1648

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

QUALITY CUSTOM DISTRIBUTION,
*Petitioner-Appellant*,

*v.*

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 710,
*Respondent-Appellee*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 21-cv-01534
Honorable Nancy L. Maldonado Presiding
Subsequently reassigned Honorable Elaine E. Bucklo

BRIEF FOR RESPONDENT-APPELLEE

Joseph D. Richardson, Esquire
WILLIG, WILLIAMS & DAVIDSON
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
215-656-3655 phone
215-561-3655 facsimile
jrichardson@wwdlaw.com

*Attorney for Respondent-Appellee,*
*International Brotherhood of Teamsters*
*Local 710*

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................................. ii

TABLE OF AUTHORITIES .................................................................................. iii

JURISDICTIONAL STATEMENT ........................................................................ iv

STATEMENT OF THE ISSUES ............................................................................. 1

STATEMENT OF THE CASE ................................................................................ 2

SUMMARY OF THE ARGUMENT ....................................................................... 6

ARGUMENT ........................................................................................................... 7

  I. The Arbitrator's Award Draws Its Essence From the CBA, and Should Be Enforced. ..... 7

  II.  The Company Has Not Presented a Valid Basis For Vacating the Award. ................... 11

CONCLUSION ...................................................................................................... 13

CERTIFICATE OF SERVICE ................................................................................ i

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g) AND CR 32(c) ................................................................................................. ii

**DISCLOSURE STATEMENT**

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1648

Short Caption: Quality Custom Distribution v. International Brotherhood of Teamsters, Local 710

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

  ☑  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Teamsters Local No. 710

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Willig, Williams & Davidson

(3) If the party, amicus or intervenor is a corporation:

  i)  Identify all its parent corporations, if any; and

    N/A

  ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Joseph D. Richardson   Date: 11/4/2024

Attorney's Printed Name:  Joseph D. Richardson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address:  Willig, Williams & Davidson, 1845 Walnut St., 24th Floor, Philadelphia, PA 19103

Phone Number: 215-656-3655   Fax Number:  215-656-3655

E-Mail Address: jrichardson@wwdlaw.com

rev. 12/19 AK

# TABLE OF AUTHORITIES

**CASES**

Ameren Ill. Co. v. Int'l Brotherhood of Electrical Workers, 906 F.3d 612 (7th Cir. 2018) ....... 7, 8

Butler Mfg. Co. v. United Steelworkers of Am., AFL-CIO-CLC, 336 F.3d 629 (7th Cir. 2003).. 8

Clear Channel Outdoor, Inc. v. Painters Local 770, 558 F.3d 670, 677 (7th Cir. 2009) ............. 13

Dexter Axle Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 90, Lodge 1315, 418
    F.3d 762, 768 (7th Cir. 2005) ..................................................... 7

Ethyl Corp. v. United Steel Workers of America, 768 F.2d 180 (7th Cir. 1985) .................... 7, 12

Int'l Union of Operating Engineers, Local 139 v. J.H. Findorff & Son, Inc., 393 F.3d 742, 745
    (7th Cir. 2004) ................................................................ 11

Jasper Cabinet Co. v. United Steelworkers, 77 F.3d 1025, 1030 (7th Cir. 1996) ........................ 9

NIPSCO v. United Steelworkers of America, 243 F.3d 345, 347 (7th Cir. 2001) ........................ 8

United Food and Commercial Workers, Local 1546 v. Ill. Am. Water Co., 569 F.3d 750, 755
    (7th Cir. 2009) ............................................................ 7, 8, 11

United States Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29 (1987) ............... 7

United Steelworkers of Am. v. Enterprise Wheel and Car Corp., 363 U.S. 593 (1960) ............... 7

**TREATISES**

Elkouri & Elkouri, *How Arbitration Works*, § 9.2.A (8th ed. 2016) ............................................. 8

## JURISDICTIONAL STATEMENT

The jurisdictional summary in the Appellant's brief is complete and correct.

**STATEMENT OF THE ISSUES**

1.  Whether the Court, in the exercise of its "very limited" role in reviewing the underlying arbitration award, should find that the Arbitrator's Award, which centers on the Arbitrator's interpretation of the term "Act of God," draws its essence from the collective bargaining agreement and should be enforced.

## STATEMENT OF THE CASE

Quality Custom Distribution ("QCD" or "the Company") and Local 710 are Parties to a Collective Bargaining Agreement ("CBA") entered into on June 1, 2019. (SA-195 ¶ 2.) QCD is the major distributor for Starbucks Stores located in the Chicago area.  (SA-168 ¶ 7.)  Local 710 represents a bargaining unit of Warehousemen, Drivers, Drivers Helpers and Sanitation employees employed by QCD.  (SA-195 ¶ 1.)

At the heart of the dispute in this matter is the weekly hour guarantee provision of the CBA. (SA-168 ¶ 6; SA-196 ¶ 5.)  Specifically, section 4.5 of the CBA guarantees that the top 80% of the seniority roster of QCD employees will have 40 hours of work per week, "or its equivalent in pay[.]"  (Id.)  The CBA provides an exception to this 40- hour guarantee:  "In the event of an 'Act of God,' the Employee shall not be guaranteed 40 hours for that week."  (SA-196 ¶ 5.)  The CBA does not further define the term "Act of God."  (SA-24–SA-58.)

Beginning in March 2020, the COVID-19 pandemic resulted in the temporary closure of many of the Starbucks stores in the Chicago land area.  (SA-169 ¶ 8.)  On or about March 26, 2020, QCD notified Local 710 that it was reducing work hours for its bargaining-unit employees from 40 hours per week to 30 hours per week.  (SA-196 ¶ 8.)  This reduction in hours lasted from April of 2020 until early June of 2020.  (SA-196 ¶ 8.)

On April 17, 2020, the Union filed a unit-wide formal grievance against QCD pursuant to the procedures set forth by the CBA for failing to guarantee 40 hours of work per week during this time. (SA-169 ¶ 10; SA-197 ¶ 9.)  Because the grievance was ultimately not resolved, the Union filed its arbitration demand against QCD for breach of the CBA.  (SA-197 ¶ 10.)  The CBA's arbitration clause (Article 11, Section 11.4), provides in relevant part:

> The Arbitrator shall be bound by the express provisions of this Agreement and shall not have the power to add or subtract from or modify any of the express

2

provisions of this Agreement, not [sic] create any obligation not expressly intended by the provisions of this Agreement, nor find that any time limit has been waived absent specific written agreement of the parties to such waiver. The Arbitrator's decision consistent with this authority shall be final and binding on the Employer, the Union, and the employees.

(SA-199 ¶ 17.)  The issue presented to the Arbitrator was:

Whether the Company violated the parties' collective bargaining agreement when it suspended the contractual forty-hour guarantee and instituted a reduction to thirty hours per week in April 2020? If so, what shall be the remedy?

(SA-198 ¶13.)  Following a hearing by videoconference and submission of written briefs, the Arbitrator issued an award sustaining the Union's grievance.  (SA-195 ¶ 4, SA-197 ¶ 12.)

The Parties agree that the award turns on the Arbitrator's application of the Act-of-God exemption to the 40-hour guarantee set forth in Section 4.5 of the CBA.  (SA-198 ¶ 16.)  The Arbitrator noted that the Parties agreed that the term "Act of God" was not further defined in the CBA, and that it should be given its plain and ordinary meaning.  (SA-77.)  The Arbitrator then articulated his understanding of the plain and ordinary meaning of the term "Act of God," namely "a natural hazard outside of human control, something for which no human may be held responsible," and listed "tornadoes or earthquakes" as examples.  (SA-77.)  The Arbitrator explained that the typical definition of an Act of God is a "single incident that occurs quickly and without warning" and distinguished this from the COVID-19 pandemic, which the Arbitrator characterized as a "slow-moving disaster for which the human element has been a major contributing factor."  (SA-77.)  Evidenced by the language in the CBA stating that in the event of an "Act of God" the employee would not be guaranteed 40 hours of work "for that week[,]" the Arbitrator found that the exclusion of the pandemic and the related economic downturn from the definition of "Act of God" for the purposes of the contract was consistent with the parties' intent in drafting the CBA.  (SA-77.)   He then applied his interpretation of the term "Act of God" in

the CBA to the circumstances facing the Company in the Spring of 2020.  In so doing, he properly distinguished between the COVID-19 pandemic generally and the "general business downturn that occurred during the time period at issue was due to the cascading impact of the general lack of an appropriate and timely  response to the virus' emergence that might have limited its spread," which he found to be "directly responsible" for the lost business volume that the Company relied on as the justification for avoiding its obligation to pay the 40-hour guarantee under the CBA.  (SA-78–SA-79.)  He concluded that QCD, as the party invoking the "Act of God" language, had the burden of proof on this point, and that it failed to "brin[g] forward sufficient evidence to establish the pandemic as an 'Act of God,' and to establish that this 'Act of God' had directly caused the drop in its business volume."  (SA-80.)  The Arbitrator therefore sustained the Union's grievance and ordered the Company to pay the balance of the forty-hour guarantee to the affected employees for the applicable period.  (SA-81–SA-82.)

On March 19, 2021, the Company filed a petition to vacate the arbitration award and a motion to vacate the award in the District Court.  (Dist. Ct. Dkt. 1, 6.)  On April 26, 2021, the Union filed a motion to dismiss the petition, arguing that the Company improperly relied upon the Federal Arbitration Act as the basis for the Court's jurisdiction.  (Dist. Ct. Dkt. 16.)  On May 11, 2021, the Union filed a complaint to confirm and enforce the arbitration award against QCD. (Complaint, Int'l Bhd. of Teamsters, Local 710 v. Quality Custom Distribution, No. 1:21-cv-01534 (N.D. Ill. Mar. 19, 2021), Dkt. No. 1.)  The Union then moved the District Court to reassign that case and consolidate it with the instant case, which was granted on June 23, 2021. (Dist. Ct. Dkt. 27, 28.)

On October 19, 2021, the District Court issued an order denying the Union's motion to dismiss as moot, denying the Company's motion to vacate the arbitration award as moot, and

directing the Company to file its answer to the Union's complaint to enforce the arbitration award.  (Dist. Ct. Dkt. 34.)  The District Court ultimately concluded that while the Company failed to establish that jurisdiction existed under the Federal Arbitration Act ("FAA"), the District Court did have jurisdiction under the Labor Management Relations Act ("LMRA") because the LMRA confers federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." (Dist. Ct. Dkt. 34 at 3) (citing 29 U.S.C. §§ 185(a), (c)).  The parties then both moved for summary judgment. (SA-1–SA-166.)  On March 22, 2024, the District Court issued its decision granting the Union's motion for summary judgment and denying the Company's parallel motion. (A-1–A-6.)

## SUMMARY OF THE ARGUMENT

The arbitration award challenged here by the Company easily meets the highly deferential standard applied on review in this Court, under which an arbitrator's award must be enforced provided it "draws its essence from the collective bargaining agreement."  The arbitrator in this case did precisely what the parties empowered him to do:  he interpreted an otherwise undefined term in the collective bargaining agreement—"Act of God"— and then decided whether it applied in the circumstances presented by the economic downturn in the service industry that occurred during the height of the COVID-19 pandemic.  In so doing, he explicitly interpreted "Act of God" in accordance with its plain and ordinary meaning.

Although the Company pays lip service to the applicable legal standard, it essentially argues that the arbitrator's interpretation of "Act of God" was wrong—as the Company puts it, "If COVID-19 is not an Act of God, none exists."  (Br. 16)  But by arguing that the Arbitrator's *interpretation* was incorrect, the Company concedes, tacitly at least, that the Arbitrator did in fact interpret the agreement.  And while the Union forcefully disagrees that the Arbitrator erred in his interpretation, that is beside the point:  The Company got precisely what it bargained for, which was a final and binding arbitration award interpreting the collective bargaining agreement.

# ARGUMENT

**I.    The Arbitrator's Award Draws Its Essence From the CBA, and Should Be Enforced.**

Courts are extremely reluctant to disturb an arbitral award and accord an arbitrator's decision extreme deference.  *Ameren Ill. Co. v. Int'l Brotherhood of Electrical Workers*, 906 F.3d 612, 616–17 (7th Cir. 2018).  An arbitral award is legitimate provided it "draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice." *United States Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987) (internal quotations and citations omitted).  Courts are limited to evaluating whether the Arbitrator "exceeded the scope of his submission," not whether the Arbitrator made a factual or legal error.  *United Steelworkers of Am. v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597 (1960); *see also Misco*, 484 U.S. at 38 ("As long as the Arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."); *Ethyl Corp. v. United Steel Workers of America*, 768 F.2d 180, 184–85 (7th Cir. 1985) ("But all this just amounts to saying that the Arbitrator may have been wrong, maybe even clearly wrong; it does not show that he was doing something other than interpreting the contract.") (Posner, J.).

The Court must "resolve any reasonable doubt about whether an award draws its essence from the [CBA] in favor of enforcing the award."  *Dexter Axle Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 768 (7th Cir. 2005) (internal quotation marks and citation omitted).  "[I]t is only when the Arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference) that the award can be said not to draw its essence from the [CBA]."  *United Food and Commercial Workers, Local 1546 v. Ill. Am. Water Co.*, 569 F.3d

750, 755 (7th Cir. 2009) (internal quotation marks and citation omitted). Thus, an arbitrator's award should be vacated "only if there is no possible interpretive route to the award." *NIPSCO v. United Steelworkers of America*, 243 F.3d 345, 347 (7th Cir. 2001) (internal quotation mark and citation omitted). This highly deferential standard of review is rooted in a respect for the role of the Arbitrator and a reluctance to transform arbitration into "just the first of a series of steps that always culminate[s] in court litigation." *Butler Mfg. Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 336 F.3d 629, 632 (7th Cir. 2003); see also *Ameren*, 906 F.3d at 616–17.

The Company admits that the Arbitrator's decision "turns on the interpretation and application of the 'Act of God' exemption" to the 40-hour guarantee in Section 4.5 (SA-199 ¶ 16), conceding what is clear from the face of the Award: the Arbitrator was interpreting the agreement, not relying on some external "body of thought, or feeling, or policy, or law." *United Food and Commercial Workers, Local 1546 v. Ill. Am. Water Co.,* 569 F.3d 750, 755 (7th Cir. 2009). After summarizing the relevant facts—including the Company's express reliance on the "Act of God" provision at the time it refused to pay the guarantee—the Arbitrator addressed himself to the central issue in this case: how the term "Act of God" was to be applied the business circumstances in the Spring of 2020. He noted that the parties agreed that the term "Act of God" is not further defined in the Agreement and that it should therefore be "understood and applied in accordance with its plain and ordinary meaning." (*Id.*, p. 60) Not only was this approach urged by both the Company and the Union, but it was also consistent with the commonly applied interpretive methods of labor arbitration. *See* Elkouri & Elkouri, *How Arbitration Works*, § 9.2.A (8th ed. 2016)(observing that "[m]ost arbitrators . . . continue to adhere to the 'plain meaning' rule"); *Jasper Cabinet Co. v. United Steelworkers*, 77 F.3d 1025

(7th Cir. 1996) (observing that arbitrator applied the plain meaning of the applicable contract language).

The Arbitrator then articulated his understanding of the plain meaning of the term "Act of God," which he described as "a natural hazard outside of human control, something for which no human may be held responsible." (SA-77) The Arbitrator explained that the typical definition of an Act of God is a "single incident that occurs quickly and without warning" and distinguished this from the COVID-19 pandemic, which the Arbitrator characterized as a "slow-moving disaster for which the human element has been a major contributing factor." (SA-77.) Evidenced by the language in the CBA stating that in the event of an "Act of God" the employee would not be guaranteed 40 hours of work "for that week[,]" the Arbitrator found that this interpretation of the pandemic was consistent with the Parties' intent as expressed in the CBA. (SA-77.)

Having explained his interpretation of the term "Act of God" as used in the Parties' collective bargaining agreement, the Arbitrator then assessed whether the COVID-19 pandemic or the resulting impact on QCD's business volume fell within that definition, observing:

> [B]y the time period at issue here, the pandemic had been allowed to spread globally and affect so many aspects of life because the reactions of governments, public and private institutions, and individuals to the pandemic generally were too little and too late. The spread and negative impact of the COVID-19 pandemic could have been better controlled, but those in authority failed to act quickly and decisively enough. By late March and early April 2020, the pandemic and the damage it was causing no longer could accurately be described as an "Act of God." Instead, a significant part of all of this was the direct result of human action, human inaction, and human error.
>
> The record further demonstrates that even if the pandemic could have been appropriately considered an "Act of God" by late March and early April 2020, any impact on the volume of the Company's business was not a direct result of the pandemic. Instead, much of the general business downturn that occurred during the time period at issue was due to the cascading impact of the general lack of an appropriate and timely response to the virus' emergence that might have

9

limited its spread. By the time that governments and institutions finally did begin
to take concrete steps to respond to the virus, the virus already had spread so far
that extreme measures had to be implemented to address its effects. These
extreme measures were far more directly responsible for the drop in the volume of
business that the Company experienced than was the virus itself. Had effective
responsive measures been implemented earlier and more broadly, then it is
possible that the pandemic's spread could have been curbed and better controlled
without the need for the sort of extreme measures that were put in place around
and during the relevant time period. All of this was caused and directed by human
governments and institutions, and these measures cannot be characterized as
natural hazards beyond human control. Again, I find that the Company's business
volume was not directly affected by an "Act of God."

(SA-79-80). In so doing, he properly distinguished between the COVID-19 pandemic generally
and the "general business downturn that occurred during the time period at issue was due to the
cascading impact of the general lack of an appropriate and timely  response to the virus'
emergence that might have limited its spread," which he found to be "directly responsible" for
the lost business volume that the Company relied on as the justification for avoiding its
obligation to pay the 40-hour guarantee under the CBA. He concluded:

The COVID-19 pandemic cannot be deemed an "Act of God" under Section 4.5 of
the Agreement under the circumstances that existed at the time that the Company
unilaterally reduced the work hours for drivers and warehouse employees below
the 40-hour minimum guarantee. The Company therefore cannot rely upon the
"Act of God" exception to Section 4.5's guarantee of a forty-hour minimum for
employees covered by the parties' Agreement. There is no other basis in the
Agreement for any departure from the forty-hour minimum, so I must find that the
Company's unilateral decision to temporarily reduce work hours for its drivers and
warehouse employees below Section 4.5's guaranteed minimum of forty hours
violated the parties' Agreement.

(*Id.*)

As the foregoing shows, the Award is demonstrably based on the Arbitrator's articulation
and application of the plain meaning of the term "Act of God" to the damage caused by the
COVID-19 pandemic and the specific circumstances existing at the time the Company relied on
that language to avoid its obligation to pay the 40-hour guarantee. Thus, the Arbitrator did not

"disregard the contractual language and dispense his own brand of industrial justice." *See*

*UFCW Local 1546,* 569 F.3d at 755. Rather, he did precisely what the parties bargained for in

the arbitration clause in their collective bargaining agreement, giving the express provisions of

the CBA their plain and ordinary meaning, and then applying those terms to the dispute raised in

the grievance without adding to, subtracting from, or modifying those terms.

## II.     The Company Has Not Presented a Valid Basis For Vacating the Award.

Although it uses the language of the appropriate standard of review, the Company's

argument focuses on its disagreement with the Arbitrator's interpretation of the term "Act of

God" as used in the forty-hour guarantee provision in the collective bargaining agreement. As

the Company puts it, "If COVID-19 is not an Act of God, none exists,"[1] from which it

characterizes the Arbitrator's interpretation and application of the "Act of God" provision as

"disregard[ing] unambiguous language" of the agreement. (Br. 16) But "[t]here is a big

difference—a clear difference, a plain difference—between misunderstanding and ignoring

contractual language." *Int'l Union of Operating Engineers, Local 139 v. J.H. Findorff & Son,*

*Inc.*, 393 F.3d 742, 745 (7th Cir. 2004). The Company's disagreement with the Arbitrator's

interpretation of the term "Act of God"—even if it were justified, which it is not—is simply not a

basis for seeking to vacate the award: a "misinterpretation of contractual language, no matter

how 'clear,' is within the Arbitrator's powers; only a decision to ignore or supersede language

conceded to be binding allows a court to vacate the award." *Id.*

---

[1] The Company's pronouncement that the COVID-19 pandemic must be an Act of God for the purposes of the contract is both unsupported and misses the point: the Arbitrator expressly distinguished between the pandemic itself and the related economic slowdown that he found to be the proximate cause of the Company's loss of business during the applicable period. (SA-78–SA-79)

Contrary to the Company's claim that the Arbitrator exceeded his authority and based his decision on extra-contractual considerations, the Award is narrowly focused on whether the pandemic-related economic slowdown that prompted the Company to impose across-the-board hours reductions was an "Act of God" *for the purposes of the contract*.  In fact, when the Company presented evidence in arbitration regarding public-policy statements characterizing the COVID-19 pandemic as an "Act of God" by the Governor of Illinois and the Archdiocese of Chicago in contexts entirely unrelated to the contract or the grievance, the Arbitrator explicitly held that those statements were irrelevant to the interpretation of the collective bargaining agreement.  (SA-78.)  Bizarrely, the Company now asserts that the Arbitrator based his decision "on some body of thought or feeling or policy" outside the agreement, even though it was the Company that attempted to bring in such external considerations, and the Arbitrator refused to rely on them.  (Br. 15–16.)  Moreover, the only element of the Arbitrator's award the Company cites to show that the Arbitrator relied on some external "body of thought or feeling or policy" is his factual determination that  "humans could have controlled the nature and extent of the pandemic."  (Br. 15.)  The Company does not explain how this factual determination evidences reliance on some external body of thought, but the implication is that this factual determination is so plainly at odds with the contractual language as to show a departure therefrom.  But this Court has found that such an argument, which "just amounts to saying that the Arbitrator may have been wrong . . . [,] does not show that he was doing something other than interpreting the contract."  *Ethyl Corp. v. United Steel Workers of America*, 768 F.2d at 184–85.

Indeed, the underlying dispute in this case has always been about the meaning of "Act of God" in Section 4.5:  the Company interpreted this term by relying on it to justify its refusal to pay the 40-hour guarantee, it argued for the same interpretation before the Arbitrator, and, when

the Arbitrator disagreed with its interpretation, it refused to comply and asked both the Court below and now this Court to vacate the Award. Or, put another way, QCD's contentions are "simply another way of arguing that the [arbitrator's] decision is wrong on the merits," which is "precisely the type of argument that is beyond [the Court's] purview." *Clear Channel Outdoor, Inc. v. Painters Local 770*, 558 F.3d 670, 677 (7th Cir. 2009).

## CONCLUSION

For the foregoing reasons, the Union respectfully requests that the Court deny the Company's appeal, affirm the decision of the District Court, and enforce the Arbitrator's award.

Dated:  November 4, 2024

s/ Joseph D. Richardson
Joseph D. Richardson, Esquire
WILLIG, WILLIAMS & DAVIDSON
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
215-656-3655 phone
215-561-3655 facsimile
jrichardson@wwdlaw.com

*Attorney for Respondent-Appellee, International
Brotherhood of Teamsters Local 710*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024, I filed the foregoing document

with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by

using the CM/ECF system.  I certify that the participants in the case are registered CM/ECF

users and that service will be accomplished by the CM/ECF system.  I further certify that two

copies of the brief were delivered to Counsel for Plaintiff-Appellant, Quality Custom

Distribution.


Dated:  November 4, 2024        /s/ Joseph D. Richardson       
                                 Joseph D. Richardson, Esquire
                                 WILLIG, WILLIAMS & DAVIDSON
                                 1845 Walnut Street, 24th Floor
                                 Philadelphia, PA 19103
                                 215-656-3655 phone
                                 215-561-3655 facsimile
                                 jrichardson@wwdlaw.com

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE**
**32(a)(7), FRAP RULE 32(g) AND CR 32(c)**

The undersigned further certifies that this Brief is proportionally spaced and contains 3,705 words within 14 pages, excluding the parts of the document that are exempted by FRAP Rule 32(f), according to the Word Count function of Microsoft Word.  As a member of the Seventh Circuit Bar, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 4, 2024 /s/ Joseph D. Richardson
Joseph D. Richardson, Esquire
WILLIG, WILLIAMS & DAVIDSON
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
215-656-3655 phone
215-561-3655 facsimile
jrichardson@wwdlaw.com